CLERK'S COPY

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO

99 JAN 22 PM 2: 08

*Robert M. March*
CLERK-SANTA FE

RUTH L. AND WILLIAM M. SILER,

      Plaintiffs,

      vs.                        No. Civ. 97-0290 SC/RLP

HEALTH CARE FINANCING
ADMINISTRATION,

      Defendant.


## MEMORANDUM OPINION AND ORDER

THIS MATTER comes before the Court on Defendant's Motion to Dismiss or,

in the Alternative, Motion to Affirm the Agency Decision, filed January 20, 1998,

[Doc. No. 25].[1] The Court, having considered the parties' pleadings and supplemental

papers, the Transcript of the Administrative Record, and being apprised of the

applicable law, rules that the Defendant's motion is not well taken and will be denied

for the reasons set forth below. I find that I have subject matter jurisdiction to review

the Agency decision in this case, and I am reversing that decision and remanding the

---

[1] Also before the Court is Plaintiffs' Request for Preliminary Injunction, filed May 21, 1997, [Doc. No. 8], and Plaintiffs' Motion Requesting Oral Argument, filed February 20, 1998, [Doc. No. 35]. Plaintiffs' motion for oral argument will be denied. After examining the briefs and record, I have determined that oral argument would not materially assist the determination of this matter. Plaintiffs' motion for a preliminary injunction also will be denied. The passage of time and this decision render Plaintiffs' request for a preliminary injunction moot.

39

issue of actual damages to the Secretary of the United States Department of Health and Human Services (Secretary).

In 1987, Plaintiff Ruth L. Siler (Mrs. Siler) submitted a Medicare Part A claim for medical bills resulting from an injury and subsequent hospitalization in Nova Scotia, Canada. Defendant denied that claim. Plaintiffs subsequently received a default judgment against the Medicare fiscal intermediary and levied on that judgment. Defendant then claimed that this judgment constituted an overpayment to Mrs. Siler. To recoup the alleged overpayment (with interest), Defendant subsequently withheld Mrs. Siler's Medicare Part B benefits and her monthly Social Security benefit. Plaintiffs are seeking judicial review of Defendant's denial of Mrs. Siler's 1987 Medicare Part A claim and of Defendant's subsequent recoupment efforts. Defendant contends that this Court lacks subject matter jurisdiction over Plaintiffs' claims because of Plaintiffs' failure to exhaust their administrative remedies, or in the alternative, if jurisdiction exists, that the agency decision should be affirmed.

## I. REGULATORY BACKGROUND

The controversy in this case involves Title XVIII of the Social Security Act (the Medicare Act), 42 U.S.C. § 1395 *et seq*. There are two types of Medicare benefits or claims: Part A and Part B. Generally, Part A claims are for the hospital insurance portion of the federal program of health insurance for the aged and disabled, covering in-patient care and related services, while Part B claims cover out-patient care. See 42

2

U.S.C. §§ 1395c-1395i (Part A), 1395j-1395*l* (Part B). Part A is funded by Social Security taxes, while Part B is a voluntary, supplemental medical insurance program for those over 65 years of age or disabled, and for which monthly premiums are paid by the beneficiaries. See Abbey v. Sullivan, 788 F. Supp. 165, 166 (S.D.N.Y. 1992), judgment aff'd, 978 F.2d 37 (2d Cir. 1992). The United States Department of Health and Human Services (HHS) contracts with fiscal intermediaries or carriers, who generally are private insurance companies, to administer the Part A and B programs. See 42 U.S.C. § 1395h; 42 C.F.R. §§ 400.202, 421.1, 421.3, 421.5, 421.100, 421.200 (1988); see also Abbey, 788 F. Supp. at 166.

Administrative appeals processes exist for Medicare beneficiaries who contest a denial of their Part A or Part B claims. Medicare beneficiaries may seek federal judicial review of their denied claims after they have exhausted the relevant administrative appeals process and there is a "final decision" of the Secretary. See 42 U.S.C. §§ 1395ii (incorporating 42 U.S.C. § 405(a), (h), (*l*)), 1395ff(b) (incorporating 42 U.S.C. § 405(g)). For disputed Medicare Part A claims, there is a four-step administrative review process: (1) beneficiary presents claim to fiscal intermediary; (2) if claim denied, then, within 60 days of denial, beneficiary may request reconsideration by intermediary; (3) if reconsideration denied, and amount of controversy is at least $100, then, within 60 days of denial, beneficiary may request hearing by Administrative Law Judge (ALJ); and (4) if ALJ affirms previous denials, then, within

time stated in ALJ decision, beneficiary may request review of ALJ denial by Appeals

Council (now the Departmental Appeals Board Appeals Council). See 42 U.S.C. §

1395ff(b) (incorporating § 405(b)); 42 C.F.R. §§ 405.701-405.723, 405.724

(incorporating 20 C.F.R. § 404.967) (1988 & 1992). If the amount in controversy is at

least $1000, within 60 days of the Appeals Council decision, the beneficiary may seek

federal judicial review. See 42 U.S.C. §§ 405(g), 1395ff(b)(2)(A); 42 C.F.R.

§ 405.730 (1988 & 1992).

For disputed Medicare Part B claims, there is a five-step administrative appeals

process which replicates the Part A procedure, except for inclusion of an additional step

before the ALJ step: (1) beneficiary presents claim to carrier (or fiscal intermediary);

(2) if claim denied, then, within 60 days of denial, beneficiary may request

reconsideration by carrier; (3) if reconsideration denied, and amount in controversy is

at least $100, within six months of the denial, the beneficiary may request a "fair

hearing" before a Hearing Officer appointed by the carrier; (4) if denial of claim by

Hearing Officer, and amount in controversy is at least $500, then, within 60 days of

denial, beneficiary may request hearing by ALJ; and (5) if ALJ affirms previous

denials, then, within time stated in ALJ decision, beneficiary may request review of

ALJ denial by Appeals Council (now the Departmental Appeals Board Appeals

Council). See 42 U.S.C. §§ 1395u(b)(3)(C), 1395ff(b)(2)(B); 42 C.F.R. §§ 405.801-

405.835, 421.5(c) (1988 & 1992); Abbey, 788 F. Supp. at 166-67. If the amount in

4

controversy is at least $1000, within 60 days of the Appeals Council decision, the beneficiary may seek federal judicial review. See 42 U.S.C. § 1395ff(b)(2)(B).

## II. SUBJECT MATTER JURISDICTION

Defendant contends that I lack subject matter jurisdiction over Plaintiffs' Complaint because Plaintiffs failed to timely exhaust their administrative remedies and, thus, there is no "final decision" of the Secretary subject to judicial review. When subject matter jurisdiction is questioned, a court first must find that it has jurisdiction before proceeding to consider the validity of a claim. See Bell v. Hood, 327 U.S. 678, 682-83 (1946); see also Health Care Review Inc. v. Shalala, 926 F. Supp. 274, 279 (D.R.I. 1996). A plaintiff bears the burden of establishing that the court has subject matter jurisdiction over her claims. See Miller v. United States, 710 F.2d 656, 662 (10th Cir. 1983). Because Plaintiffs are proceeding *pro se* I hold their pleadings to a less stringent standard than I would those filed by an attorney and I liberally construe their Complaint. See Haines v. Kerner, 404 U.S. 519, 520 (1972); Northington v. Jackson, 973 F.2d 1518, 1520-21 (10th Cir. 1992); Hall v. Bellmon, 935 F.2d 1106, 1110 (10th Cir. 1991).

### A. Factual Background

The controversy in this case has lasted more than a decade. Unfortunately, the procedural path that has taken the parties to this point is rather muddy. The procedural facts are summarized in the two charts below--a Medicare chart and a Social Security

chart.[2] (A more exhaustive description of the procedural facts, together with citations to the Transcript of the Administrative Record, is attached as an appendix to this Opinion.) The facts in the Medicare Chart below are divided into two columns--the facts that could be described as (1) Part A procedure, and (2) Part B procedure. The Part B procedure column is further divided into two sub-columns--facts that could be described as Part B procedure initiated (a) before 1992 and (b) in 1992. Some of the facts in this case are difficult to categorize as either Part A procedure or Part B procedure. These facts are *italicized* and provided, alternatively, in both the Part A and Part B columns. The Social Security Chart below summarizes, in chronological fashion, the Social Security events in this case.[3] (The date that this lawsuit was filed is *italicized* in both Charts.)

---

[2] Although many of the actions taken in this case by Plaintiff were performed actually by her husband, Mr. Siler, on Plaintiff's behalf, the two Charts will refer generally to those acts as Plaintiff's acts.

[3] The applicable Social Security administrative review procedure was not briefed by the parties and is not delineated in the Social Security Chart.

# MEDICARE CHART

| MEDICARE PART A PROCEDURE | MEDICARE PART B PROCEDURE | |
|---|---|---|
| | Initiated Before 1992 | Initiated In 1992 |
| Oct. 2, 1987 - Ruth Siler (Siler) injured in Canada and hospitalized | | May & Nov. 1992 - Ruth Siler (Siler) visits her doctor, receives chest x-ray and eyeglasses |
| Step 1 - Initial Determination by Intermediary (Transamerica) | Step 1 - Initial Determination by Carrier/Intermediary (Transamerica) | |
| (a)<br>November 26, 1987 - Siler submits Medicare Part A claim for medical services resulting from Canadian injury<br>(Siler subsequently resubmits claim twice) | (a) | (a)<br>May & Nov. 1992 - Siler or her medical provider submits Medicare Part B claims for services provided in those months |
| (b)<br>April 1, 1988 - Transamerica denies claim<br>(Transamerica informs Siler she has 6 months to request a review of denial) | (b)<br>*Aug. 24, 1989* - *Transamerica's Recoupment Sect. informs Siler she needs to refund overpayment she received as result of 1988 default judgment (Transamerica informs Siler that if it does not hear from her in 30 days, it will withhold her future Medicare benefits, and if it does not hear from her in 90 days, it will withhold her monthly Social Security benefit) (Transamerica informs Siler she has 6 months to request new internal review of claim)* | (b)<br>Feb. & March, 1993 - Transamerica informs Siler it is withholding her Part B benefits to recoup overpayment she received as result of 1988 default judgment (Transamerica informs Siler she has 6 months to appeal) |
| Step 2 - Reconsideration of Denial by Intermediary | Step 2 - Reconsideration of Denial by Carrier/Intermediary | |
| (a)<br>April 7, 1988 - Siler requests review of claim denial<br>(Siler subsequently resubmits reconsideration request) | (a)<br>*Aug./Sept. 1989* - *Siler requests review* | (a)<br>March 6, 1993 - Siler notifies Transamerica she objects to withholding of her Part B benefits |

| MEDICARE PART A PROCEDURE | MEDICARE PART B PROCEDURE | |
|---|---|---|
| | Initiated Before 1992 | Initiated In 1992 |
| * * * *<br>Sept. 9, 1988 - Transamerica informs Siler it does not handle this type of billing, that claim needs to be filed with the Plan A intermediary<br>(no acknowledgment of previous claim filing, claim denial, or review request)<br><br>Oct. 5, 1988 - Siler files suit against Transamerica in municipal court in California<br><br>Nov. 14, 1988 - Default judgment entered against Transamerica<br><br>Feb. 1989 - Default judgment levied against Transamerica<br>(resulting in the "overpayment" to Siler)<br>* * * * | * * * *<br>*Sept. 15, 1989 - Transamerica's Overpayment Sect. refers Siler's request to Michael Souza (Souza) of the Health Care Financing Administration's (HCFA) San Francisco Office*<br><br>*Sept. 19, 1989 - Transamerica decides to refer Siler's request to its Appeals Dept., instead of to the HCFA*<br>* * * * | * * * *<br>March 26, 1993 - Transamerica's Recoupment Sect., in response to Siler's March 6 letter, informs Siler that withheld Part B benefits had been applied to overpayment amount<br><br>March 31, 1993 - Siler again objects to recoupment action<br>* * * * |
| (b)<br>*Aug. 24, 1989 - Transamerica's Recoupment Sect. informs Siler she needs to refund overpayment she received as result of 1988 default judgment*<br>*(Transamerica informs Siler that if it does not hear from her in 30 days, it will withhold her future Medicare benefits, and if it does not hear from her in 90 days, it will withhold her monthly Social Security benefit)*<br>*(Transamerica informs Siler she has 6 months to request new internal review of claim)* | (b)<br>*Sept. 20, 1989 - Transamerica's Appeals Dept. denies Siler's 1987 Part A claim and affirms that Siler received overpayment and must repay*<br>*(Transamerica informs Siler she has 6 months to request hearing by Hearing Officer)* | (b) |
| **Extra Step #1** | **Step 3 - Part B Hearing Officer Hearing** | |
| (a)<br>*Aug./Sept. 1989 - Siler requests review* | (a)<br>*Oct. 20, 1989 - Siler requests review* | (a) |

| MEDICARE PART A PROCEDURE | MEDICARE PART B PROCEDURE | |
|---|---|---|
| | Initiated Before 1992 | Initiated in 1992 |
| * * * *<br><br>*Sept. 15, 1989* - *Transamerica's Overpayment Sect. refers Siler's request to Michael Souza (Souza) of the Health Care Financing Administration's (HCFA) San Francisco Office*<br><br>*Sept. 19, 1989* - *Transamerica decides to refer Siler's request to its Appeals Dept., instead of to the HFCA*<br>* * * * | * * * *<br><br>*Oct. 30, 1989* -<br>*Transamerica informs Siler it has not heard from her and it is required to withhold any Medicare benefits she receives to recoup overpayment*<br>*(Siler subsequently writes twice to Transamerica)*<br><br>*Dec. 1, 1989* -<br>*Transamerica's Hearing Officer informs Siler he has no jurisdiction to hear her case and he is referring her file to Boston for hearing by carrier BCBS of Mass.*<br><br>*June 6, 1990* - *BCBS of Mass. Part B Hearing Officer informs Siler that on-the-record review will be forthcoming*<br>* * * * | |

| MEDICARE PART A PROCEDURE | MEDICARE PART B PROCEDURE | |
|---|---|---|
| | **Initiated Before 1992** | **Initiated In 1992** |
| **(b)**<br>_Sept. 20, 1989_ - Transamerica's Appeals Dept. denies Siler's 1987 Part A claim and affirms that Siler received overpayment and must repay (Transamerica informs Siler she has 6 months to request hearing by Hearing Officer) | **(b)**<br>_July 20, 1990_ - BCBS of Mass. Part B Hearing Officer affirms prior denials of Siler's 1987 Part A claim and affirms that recoupment via threatened withholding of Siler's Medicare benefits is proper (BCBS of Mass. Part B Hearing Officer informs Siler she has 10 days to request a new hearing before a new Part B Hearing Officer or 60 days to request an ALJ hearing) | **(b)** |
| **Extra Step # 2** | | |
| **(a)**<br>_Oct. 20, 1989_ - Siler requests review | | |
| * * * *<br>_Oct. 30, 1989_ - Transamerica informs Siler it has not heard from her and it is required to withhold any Medicare benefits she receives to recoup overpayment (Siler subsequently writes twice to Transamerica)<br><br>_Dec. 1, 1989_ - Transamerica's Hearing Officer informs Siler he has no jurisdiction to hear her case and he is referring her file to Boston for hearing by carrier BCBS of Mass.<br><br>_June 6, 1990_ - BCBS of Mass. Part B Hearing Officer informs Siler that on-the-record review will be forthcoming<br>* * * * | | |

| MEDICARE PART A PROCEDURE | MEDICARE PART B PROCEDURE | |
|---|---|---|
| | Initiated Before 1992 | Initiated in 1992 |
| (b) *July 20, 1990* - BCBS of Mass. Part B Hearing Officer affirms prior denials of Siler's 1987 Part A claim and affirms that recoupment via threatened withholding of Siler's Medicare benefits is proper (BCBS of Mass. Part B Hearing Officer informs Siler she has 10 days to request a new hearing before a new Part B Hearing Officer or 60 days to request an ALJ hearing) | | |
| **Step 3 - ALJ Hearing** | **Step 4 - ALJ Hearing** | |
| (a) *Aug. 15, 1990* - Siler requests ALJ hearing | (a) *Aug. 15, 1990* - Siler requests ALJ hearing | (a) |
| * * * * *Feb. 5, 1991* - a Part B Hearing Officer informs Siler her file is being sent to the HCFA for referral to an ALJ * * * * | * * * * *Feb. 5, 1991* - a Part B Hearing Officer informs Siler her file is being sent to the HCFA for referral to an ALJ * * * * | |
| (b) *Feb. 26, 1992* - ALJ hearing held *July 31, 1992* - ALJ affirms previous decisions (ALJ/HCFA inform Siler she has 60 days to request Appeals Council review) | (b) *Feb. 26, 1992* - ALJ hearing held *July 31, 1992* - ALJ affirms previous decisions (ALJ/HCFA inform Siler she has 60 days to request Appeals Council review) | (b) |
| **Step 4 - Appeals Council Review** | **Step 5 - Appeals Council Review** | |
| (a)(1) *Aug. 18, 1992* - Siler requests Appeals Council review | (a)(1) *Aug. 18, 1992* - Siler requests Appeals Council review | (a) |

| MEDICARE PART A PROCEDURE | MEDICARE PART B PROCEDURE | |
|---|---|---|
| | Initiated Before 1992 | Initiated In 1992 |
| * * * *<br>_Nov. 6, 1992_ - Transamerica notifies Siler that ALJ found against her and she must repay overpayment (Siler interprets this notification as denial of her 1992 Appeals Council review request)<br><br>_Nov. 18, 1992_ - Siler disputes overpayment<br>* * * * | * * * *<br>_Nov. 6, 1992_ - Transamerica notifies Siler that ALJ found against her and she must repay overpayment (Siler interprets this notification as denial of her 1992 Appeals Council review request)<br><br>_Nov. 18, 1992_ - Siler disputes overpayment<br>* * * * | |
| (a)(2)<br>_June 17, 1997_ - Siler again files request for Appeals Council review, on advice of the HCFA's Appeals Unit | (a)(2)<br>_June 17, 1997_ - Siler again files request for Appeals Council review, on advice of the HCFA's Appeals Unit | |
| (b)<br>_Sept. 26, 1997_ - Appeals Council dismisses Siler's June 1997 review request for untimeliness | (b)<br>_Sept. 26, 1997_ - Appeals Council dismisses Siler's June 1997 review request for untimeliness | (b) |
| * * * *<br>_March 6, 1997_ - Complaint filed in this lawsuit<br>* * * * | * * * *<br>_March 6, 1997_ - Complaint filed in this lawsuit<br>* * * * | * * * *<br>_March 6, 1997_ - Complaint filed in this lawsuit<br>* * * * |

# SOCIAL SECURITY CHART

| CHRONOLOGY OF SOCIAL SECURITY EVENTS | |
|---|---|
| Ruth Siler (Siler) receives monthly Social Security benefit | Sept. 17, 1996 - Siler replies to Souza, requests unbiased review |
| Feb. 10, 1996 - the Social Security Administration (SSA) notifies Siler that her monthly Social Security benefit will be withheld to recoup overpayment received as result of 1988 default judgment | Nov. 5, 1996 - Souza replies again with hostile letter, making such statements as Siler has had right to sue in federal court at any time and he would welcome opportunity for personal encounter with Siler in federal court |
| Feb. 22, 1996 - Siler requests SSA reconsideration | Jan. 20 & 30, 1997 - Siler informs the HCFA's Kansas City and Baltimore Offices that she has received no response to her Feb. 22, 1996, reconsideration requests, and asking how to proceed and how to sue in federal court |
| March 13, 1996 - SSA informs Siler it is forwarding her request for reconsideration to the HCFA | Feb. 4, 1997 - the HCFA informs Siler it has sent her reconsideration request to its San Francisco Office |
| Aug. 23, 1996 - Siler writes to Michael Souza (Souza) of the HCFA's San Francisco Officer re: her frustration with the handling of her Medicare and Social Security appeal requests | March 5, 1997 - Souza notifies Siler that he is dismissing her reconsideration request because she has exhausted all available administrative appeal mechanisms and that the ALJ decision was the Secretary's final decision because no record of appeal of ALJ's decision by Siler filed with Appeals Council (Souza informs Siler that SSA will begin withholding her monthly Social Security benefit to recoup overpayment) |
| Aug. 30, 1996 - Souza replied to Siler with hostile letter, making such statements as his office will move mountains to recover every cent Siler owes | *March 6, 1997 - Complaint filed in this lawsuit* |

13

## B.  Analysis

Based on the relevant Medicare law and the procedural facts, I conclude that I have subject matter jurisdiction for two alternative reasons.[4]  First, Plaintiff timely complied with the letter of the applicable regulations, exhausting her administrative remedies, which resulted in a judicially reviewable "final decision" of the Secretary. Second, in the alternative, Defendant failed to follow the Medicare administrative appeals procedure(s), precluding the necessity for exhaustion beyond presentment of the 1987 claim.

### 1.  Exhaustion Occurred

Giving muddy procedure the clearest possible interpretation, steps one through three of the Medicare Part A procedure were exhausted by Plaintiff:  (1) on November

---

[4] The proper parties have not been named in this lawsuit. Plaintiff William M. Siler (Mr. Siler) does not have standing to bring this lawsuit. Medicare or Social Security claims of Mr. Siler are not at issue here and Mr. Siler was not a party to any of the prior administrative decisions, although he has acted on his wife's behalf on many occasions. Under 42 U.S.C. § 405, the only persons who may commence an action in federal district court to review prior administrative hearing decisions are those who were parties to such administrative hearings. Therefore, *sua sponte*, I will dismiss Mr. Siler as a party from this action. Any reference to "Plaintiff" in the remainder of this Opinion will refer only to Ruth L. Siler (Mrs. Siler). As stated previously, many of the actions taken in this case by Plaintiff were performed by her husband, Mr. Siler, on her behalf. I will refer generally, however, to those acts as Plaintiff's acts and not as Mr. Siler's acts.

The named defendant in this action is the Health Care Financing Administration (HCFA). Defendant, citing 42 C.F.R. § 421.5(b) (1988), *inter alia*, argues that the real party in interest is the Secretary of the United States Department of Health and Human Services (HHS), Donna E. Shalala, (Secretary) because it is she who administers the Medicare program and the HCFA. Although § 421.5(b)'s plain language supports Plaintiff's choice of defendant ("HCFA is the real party of interest in any litigation involving the administration of the [Medicare] program."), because the Secretary is the Administrator of the HCFA, I agree with Defendant that the Secretary (and the HHS) is the real party in interest here. For simplicity's sake, however, references herein to Defendant generally will include not only the Secretary (and the HHS), but the HCFA, Transamerica, the Social Security Administration (SSA), and their agents.

14

26, 1987, Plaintiff submitted her Medicare Part A claim for the medical services she received in Canada after her October 2, 1987, injury there and the fiscal intermediary, Transamerica, denied that claim; (2) Plaintiff requested reconsideration of the denial, and Transamerica eventually denied the claim again; and (3) Plaintiff requested review by an ALJ, and the ALJ affirmed the previous Agency decisions on July 3, 1992. The primary question raised by Defendant in its motion is whether Plaintiff timely requested review of the ALJ decision by the Appeals Council in 1992 and exhausted that part of the administrative process.[5]

---

[5]   Recently, in a Social Security disability insurance benefits case, the Tenth Circuit held that when an individual untimely requests Appeals Council review of an ALJ decision, and the Appeals Council dismisses the review request as untimely, a federal court lacks subject matter jurisdiction because there is no final decision of the Secretary for the court to review pursuant to 20 C.F.R. § 404.972. See Brandtner v. Department of Health and Human Servs., 150 F.3d 1306-07 (10th Cir. 1998). (In Brandtner, the Tenth Circuit distinguished among the Appeals Council's (1) denial of a review request, (2) granting of a review request (with either an affirmance or a reversal of the ALJ decision), and (3) dismissal of a review request. See id. at 1307 n.2.) Brandtner, however, is inapplicable to the case at bar. First, unlike here where the issue of timeliness is hotly contested, in Brandtner there was no question that the plaintiff's Appeals Council review request was untimely. See id. at 1306. Second, Brandtner, and the cases it relies upon, are Social Security disability cases and construe 20 C.F.R. § 404.972, which provides that a dismissal by the Appeals Council is binding and the Agency decision not subject to further review. See Brandtner, 150 F.3d at 1307. Section 404.972 did not apply to Medicare Part A claims until 1997. See 42 C.F.R. § 405.724 (1997); 62 Fed. Reg. 25844, 25849-850 (1997). In 1992, the year in which the ALJ decision was rendered in this case and in which Plaintiff allegedly made her Appeals Council review request, the relevant Medicare regulations did not explicitly distinguish Appeals Council dismissals from denials or reviews nor state that Appeals Council dismissals were binding and unreviewable. See 42 C.F.R. § 405.724 (1992); see also 20 C.F.R. § 404.967 (1992). (Although the Appeals Council dismissed Plaintiff's 1997 review request, the statute of limitations for the review request as provided in the ALJ decision began running in 1992. Consequently, it is the 1992 regulations of which Plaintiff was on notice and which govern Plaintiff's Appeal Council hearing request and the Appeals Council's decision--not the 1997 regulations. Furthermore, the 1997 correspondence to Plaintiff from the HCFA regarding exhaustion of remedies and potential Appeal Council decisions did not inform Plaintiff of the dismissal possibility or that such a decision would cause the Agency decision to be unreviewable by a court. See Def. Response to Pl. Opening Brief, Exh. 2 at 243-44 (hereinafter Tran. Admin. R, at __). The Appeals Council's 1997 dismissal decision also did not provide that its decision or the ALJ's decision was

Plaintiff contends that on August 18, 1992, her husband sent a properly addressed letter to the Appeals Council, requesting a review of the ALJ's decision of July 31, 1992--well within the 60-day statute of limitations period provided by the ALJ. A copy of this August letter is part of Administrative Record.  See Def. Response to Pl. Opening Brief, Exh. 2 at 100, 240 (hereinafter Tran. Admin. R. at __).  Defendant claims that it has no record of this request letter,[6] raising the specter that this letter was never received by the Appeals Council or was never sent by Plaintiff.

A rebuttable presumption of receipt arises on evidence that a properly addressed letter was placed in the postal service's care.[7]  See Witt v. Roadway Exp., 136 F.3d 1424, 1429-30 (10th Cir. 1998), cert. denied, __ U.S. __, 119 S. Ct. 188 (1998); see also Wells Fargo Business Credit v. Ben Kozloff, Inc., 695 F.2d 940, 944 (5th Cir.

---

binding and judicially unreviewable.  See id. at 232-33, 243-44.  Nor has Defendant argued in its brief(s) that the Appeals Council's dismissal is binding and its decision or the ALJ's decision unreviewable.)  Therefore, if Plaintiff timely requested the Appeals Council review, I have jurisdiction in this case because all other requisite administrative steps have been met and the ALJ's decision is the final decision of the Secretary.

[6] Defendant's claim is contrary to the HCFA's Baltimore Office Appeals Unit statement in its June 13, 1997, letter to Plaintiff that it "found" that Plaintiff had submitted on August 18, 1992, a letter requesting an Appeals Council review of the previous denials of her 1987 claim.  See Tran. Admin. R. at 244.

[7] The Tenth Circuit has stated that presentment of a reconsideration request occurs only when the agency 'receives the request, precluding the applicability of the "presumed delivery" doctrine.  See Gonzales v. United States, 134 F.3d 382, No. 96-2167, 1998 WL 39255 at *3, (10th Cir. Jan. 30, 1998) (unpublished disposition); Moya v. United States, 35 F.3d 501 (10th Cir. 1994).  However, both Gonzales and Moya were Federal Tort Claims Act (FTCA) actions, applying 28 C.F.R. § 14.2(a) (no year given).  See Gonzales, 1998 WL 39255 at *2; Moya, 35 F.3d at 504.  This case is not brought under the FTCA, and Medicare does not have a "presentment requires receipt" provision.  Thus, presentment via receipt is unnecessary here and the mail presumption applies.

1983) ("Placing letters in the mail may be proved by circumstantial evidence . . . ."). This presumption may be rebutted by evidence of nonreceipt. See Witt, 136 F.3d at 1430. Such a rebuttal "creates a credibility issue that must be resolved by the trier of fact." Id. The mail presumption has been met and rebutted here, leaving a credibility issue for me to decide.

I find that Plaintiff's position is the more credible and that, contrary to the Appeals Council's assumption, Defendant is not entitled to a "presumption of regularity" that may attach to "official government recordkeeping responsibilities." Tran. Admin. R. at 4. Plaintiff and her husband not only persistently corresponded with Defendant for tenyears, but consistently requested reconsiderations of Plaintiff's claim denials and responded affirmatively to the innumerable notices of appeal rights. Plaintiff and her husband also consistently have asserted that they sent the August 1992 letter. The context of Plaintiff's assertions reveal no motivation to lie. That Plaintiff did not follow up or inquire further as to the Appeals Council's receipt of her request for review or as to a decision by the Appeals Council does not vitiate Plaintiff's credibility. Given the marathon nature of the review process here, the unresponsiveness of Defendant, and the inconsistent, untimely, or hasty actions of Defendant, it was reasonable for Plaintiff to believe that Transamerica's November 1992 letter (which stated that she needed to pay the alleged overpayment amount because the ALJ had found against her) was a denial of her Appeals Council appeal

17

request.  Additionally, Medicare law requires only that Plaintiff have filed her appeal request, not that she inquire further or continuously request such a review.

Defendant's inability to find Plaintiff's August 1992 letter or any trace of such a letter also is insufficient reason to doubt Plaintiff's contention.  Not only has Defendant's handling of this case involved nonresponsiveness, nonsequiturs, unreasonable delay, incompetence, and disorganization, epitomizing bureaucratic muddle, but the Appeals Council has changed its structure, its location, and its title, creating ample opportunity for Plaintiff's letter to have fallen through the cracks.  See Def. Memo. of Law, Exh. 1, at 1 n.1; 60 Fed. Reg. 64065 (1995).  Consequently, I find that Plaintiff timely appealed the ALJ's decision to the Appeals Council.  Because Plaintiff timely requested review of the ALJ's decision by the Appeals Council (and the Appeals Council has rendered a decision), I further find that the administrative remedies in this unusual case have been exhausted, and that I have subject matter jurisdiction.

## 2. Exhaustion Excused

In the event the Appeals Council's nonreceipt or misplacement of Plaintiff's 1992 review request could be construed as failure of Plaintiff to exhaust her administrative remedies, I find, in the alternative, that such failure is excused.[8]

---

[8] The waiver of exhaustion jurisprudence generally centers on a tripartite analysis of whether the plaintiff's claim is collateral to any demand for benefits, whether exhaustion would be futile, and whether the harm the plaintiff would suffer would be irreparable.  See, e.g., Heckler v. Ringer, 466 U.S. 602, 617-18 (1984); Harline v. DEA, 148 F.3d 1199, 1202-03 (10th Cir. 1998), petition for cert.

The procedural facts reveal that Defendant failed to comply with the prescribed review procedures--procedures which Defendant admits are required. Plaintiff cannot be faulted for failing to jump through every administrative hoop provided by Medicare law when Defendant did not provide the hoops in the manner required. An exhaustion of remedies requirement not only mandates that certain specified administrative steps be met, but also presupposes that the requisite administrative remedies are available or provided. Defendant focuses on the first truism, while failing to do more than facially acknowledge the latter. See Def. Memo. of Law at 4 (A Medicare beneficiary is entitled to the administrative review provided by law.); Def. Response to Pl. Opening Brief at 2 (Medicare statute and implementing regulations provide "detailed, multilayered process" of administrative review for disputed Medicare claim denials).

Defendant's procedural failures can be construed two ways--as Part A procedure or as Part A procedure followed by Part B procedure. If the procedure from Plaintiff's 1987 Part A claim submittal to Plaintiff's 1992 request for Appeals Council review is construed as Part A procedure, Defendant failed to adequately provide such review or follow the Part A appeals process. The Part A administrative appeals process clearly involves four steps: an initial intermediary determination, an intermediary reconsideration, an ALJ review, and an Appeals Council review. Transamerica failed

filed, 67 U.S.L.W. 3302 (U.S. Oct. 20, 1998) (No. 98-675); Reed v. Heckler, 756 F.2d 779,784 (10th Cir. 1985). However, I find the waiver of exhaustion analysis is inapplicable to this case. The administrative remedies were not provided by Defendant as required by law, and thus neither the doctrine of exhaustion of remedies nor the waiver exception to that doctrine have any relevancy here.

to reconsider its initial claim denial after Plaintiff repeatedly requested such a review in 1988, forcing Plaintiff to seek court action.[9] After finally reconsidering its initial denial in August 1989, instead of allowing Plaintiff to seek ALJ review of its denial on reconsideration, Transamerica added two steps to the exhaustion process--it required Plaintiff to seek a second internal reconsideration by Transamerica and it required Plaintiff to seek a review by a Plan B Hearing Officer. Neither step is part of Part A procedure and there is no statutory or regulatory provision for a conflated Part A-Part B procedure. Under this construction of the facts, it is clear that before the Appeals Council step was reached, Plaintiff was forced to seek review of her claim at least six times, rather than the three times mandated by Medicare Part A law.

If the procedure from Plaintiff's in 1987 Part A claim submittal to Plaintiff's 1992 request for Appeals Council review is construed as Part A procedure followed, after the 1988 default judgment and levy, by Part B procedure, Defendant still failed to provide Plaintiff the administrative remedies required for either Part. Regarding the Part A procedure, Plaintiff repeatedly requested a review of Transamerica's initial denial of her Part A claim, a review not only required by law but offered to Plaintiff by Transamerica itself. Transamerica's sole response was its September 9, 1988, letter, misstating that it did not handle this type of claim and failing to acknowledge that it

---

[9] Defendant complains that Plaintiff circumvented the administrative process by suing Transamerica in municipal court in 1988. However, given Transamerica's nonresponsiveness to her review requests, Plaintiff cannot be faulted for bringing the 1988 lawsuit.

already had begun the Part A review process by denying the 1987 claim and offering a review on reconsideration. By its actions and omissions, Transamerica aborted the Part A procedure after the first step. As for the Part B procedure provided Plaintiff after the 1988 court judgment and levy, this procedure had the opposite defect of the Part A procedure provided--it provided every step but the first. In 1989, when the Plan B procedure was initiated by Transamerica, Plaintiff had submitted no Part B claims and Defendant had withheld no Part B benefits. As a result, Transamerica's institution of the Plan B procedure was premature and unauthorized by statute.

However the administrative remedies provided by Defendant in this case are construed, it is clear the Defendant did not comply with the law or provide Plaintiff with the required administrative process. See 42 U.S.C. §§ 405(a), 1395ff; 42 C.F.R. §§ 405.701-405.724, 405.801-405.835 (1988 & 1992); 20 C.F.R. § 404.967 (1988 & 1992); see also Def. Memo. of Law at 4-6. By ignoring the prescribed procedures, and deleting some procedures and adding others, Defendant not only prevented Plaintiff from receiving all the process due her, but impeded her statutory right to judicial review.

In addition to the core procedural failures described above, Defendant also repeatedly failed to acknowledge the appeal requests of Plaintiff; many of the reviews occurred only after repeated requests from Plaintiff; and Defendant repeatedly informed Plaintiff that she had six months to appeal while in the same or next breath, before the

21

running of the six-month appeal time (or the 60-day statute of limitations provided by Medicare law), informed Plaintiff that it was taking negative action against her and/or demanded payment of the alleged overpayment. Furthermore, when reviews were granted, the timing of the review decisions was generally either overly slow or overly hasty. In addition, Defendant's nonresponsiveness, the number of organizational units involved (e.g., Transamerica's Recoupment Section, Transamerica's Overpayment Section, Transamerica's Appeals Department, three different offices of the Health Care Financing Administration (HCFA), HCFA's Appeals Unit, the Appeals Council), the discrepancy between Defendant's provision of a six-month statute of limitation and Medicare's provision of a 60-day statute of limitation, Defendant's omission of required review procedures, and Defendant's addition of review procedures may have confused and frustrated Plaintiff to the point that she was unaware of any failure to exhaust her administrative remedies.

Defendant also made misrepresentations to Plaintiff about the administrative review process--representations upon which Plaintiff relied in filing this lawsuit. For example, Mr. Michael Souza of the HCFA's San Francisco Office told Plaintiff (1) that she could have filed a complaint in federal court at <u>any</u> time and (2) that he looked forward to facing her and her husband in court. The first statement was untrue, and the second statement may have further misled Plaintiff into believing she was administratively free to file this lawsuit. Mr. Souza also later stated in his 1997

22

decision letter regarding Plaintiff's appeal of the withholding of her Social Security benefits that his denial of the appeal was the "final decision" of the Secretary--a statement which Plaintiff states she relied upon to file this lawsuit, see Pl. Reply Brief at 6 (filed Feb. 20, 1998).[10]

"[A]pplication of the exhaustion doctrine is 'intensely practical.'" See Bowen v. City of New York, 476 U.S. 467, 484 (1986) (quoting Mathews v. Eldridge, 424 U.S. 319, 331 n.11 (1976)). This is not a case where a plaintiff is alleging a mere "irregularity in the agency proceedings" or "mere deviation from the applicable regulations in his particular administrative proceeding." Id. at 484, 485 (discussing Eldridge and Weinberger v. Salfi, 422 U.S. 749, 765 (1975)). Rather this is a case where the agency failed to provide in large part the procedure required by law and made misrepresentations about the exhaustion process. None of the purposes behind the exhaustion doctrine would be promoted by requiring exhaustion here. See id.; see also Harline v. DEA, 148 F.3d 1199, 1203-04 (10th Cir. 1998) (describing purposes behind exhaustion doctrine), petition for cert. filed, 67 U.S.L.W. 3302 (U.S. Oct. 20, 1998) (No. 98-675). On the contrary, requiring exhaustion here would undermine the statutory scheme and not only would allow Defendant to circumvent agency review

---

[10] Given his written statements to Plaintiff in August and November 1996, Mr. Souza's role as the final reviewer of Plaintiff's Social Security claim in March 1997 violates the basic due process concept of an impartial tribunal. I also note that while Plaintiff's request for reconsideration was timely handled by the SSA, once the request was transferred by the SSA to the HCFA, Plaintiff had to request the review again and again, and the review was not performed for over a year.

23

procedures with impunity, but would encourage such behavior. "The Secretary cannot complain of failure to exhaust administrative remedies when she refuses to provide the appropriate ones." Klein v. Heckler, 761 F.2d 1304, 1312 (9th Cir. 1985). Therefore, in the alternative, I find that under the circumstances of this case, Plaintiff need not have exhausted her administrative remedies beyond initial presentment of her claim to Transamerica,[11] and that I have subject matter jurisdiction.

## III. REVIEW OF AGENCY DECISION

Defendant in its alternative Motion to Affirm the Agency Decision argues that the ALJ's decision should be affirmed because Plaintiff's Medicare Part A claim was correctly denied, and the subsequent government recoupment, through the withholding of Medicare Part B and Social Security benefits, was proper. I will treat this portion of Defendant's motion as a motion to affirm the agency action.[12]

---

[11] Title 42 U.S.C. § 405(g) provides for judicial review "after any final decision of the Secretary made after a hearing to which [the beneficiary] was a party." The "final decision" exhaustion requirement mandated by 42 U.S.C. § 405(g)

> consists of two elements, only one of which is purely "jurisdictional"
> in the sense that it cannot be waived . . . . The waivable element is the
> requirement that the administrative remedies prescribed by the
> Secretary be exhausted. The nonwaivable element is the requirement
> that a claim for benefits shall have been presented to the Secretary.

Bowen v. City of New York, 476 U.S. 467, 482-83 (1986) (internal quotations omitted). Plaintiff has clearly satisfied the nonwaivable element required by § 405(g) by correctly filing her Part A claim in 1987 (as well as her Part B claims in 1992) with the Secretary's designated intermediaries or carriers.

[12] The Tenth Circuit has held that the use of motions to affirm in administrative appeals cases is inappropriate and has expressly prohibited their use. See Olenhouse v. Commodity Credit Corp., 42 F.3d 1560, 1579-80 (10th Cir. 1994); see also Hamilton v. Secretary of Health & Human Servs., 961 F.2d 1495, 1500-04 (10th Cir. 1992) (Kane, J., concurring) (use of motions to affirm improper and

## A.    Standard of Review

Notwithstanding the difficulty of delineating the appeals procedures involved in

this case, I find that the "final decision" of the Secretary is the ALJ decision.[13]  See 42

U.S.C. §§ 405(g), 1395ff(b); see also Tran. Admin. R. at 142 (HCFA letter stating that

ALJ decision represented the "final decision" of the Secretary).  The purpose of my

review of the ALJ decision is to determine whether the record as a whole contains

substantial evidence to support the ALJ's decision and whether the ALJ applied the

proper legal standards.  See 42 U.S.C. § 405(g); see also Castellano v. Secretary of

HHS, 26 F.3d 1027, 1028 (10th Cir. 1994); Akbar-Afzali v. Callahan, 968 F. Supp.

578, 581, 582 (D. Kan. 1997).  Substantial evidence is "'such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion.'"  Castellano, 26

F.3d at 1028 (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)).  It is more

than a mere scintilla and more than mere conclusion.  See Richardson, 402 U.S. at

---

not authorized by Congress).  I find, however, that the use of a motion to affirm by Defendant in this
case is distinguishable from the Olenhouse prohibition.  Olenhouse was not a Medicare administrative
appeals case, but an agricultural administrative appeals case.  The statutory standard of review
provision for Medicare and Social Security cases provides that a district court may "enter, upon the
pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of
the Secretary, with or without remanding the cause for rehearing." 42 U.S.C. § 405(g).  Pursuant to
this language, a motion to affirm is proper in a Medicare administrative appeals case and authorized by
Congress.  See Higgins v. Shalala, 876 F. Supp. 1224, 1226 (D. Utah 1994).  Hamilton, a Social
Security case, does not change my decision.  In Hamilton, the view that motions to affirm are
inappropriate was expressed only in the concurring opinion--the majority of the Tenth Circuit panel
affirmed the district court's order to grant the defendant's motion to affirm the administrative decision.
See Hamilton, 961 F.2d at 1497, 1500; see also Higgins, 876 F. Supp. at 1226.

[13] The tape and transcript of the 1992 ALJ hearing appear to have been lost and the ALJ is
deceased.  See Def. Memo. of Law at 17 n.4; Def. Response to Pl. Opening Brief at 4 n.3; Tran.
Admin. R. at Certification page.

401; Olenhouse v. Commodity Credit Corp., 42 F.3d 1560, 1580 (10th Cir. 1994).

My review "is limited to the Secretary's final decision, the Administrative Record, and the pleadings." Westin v. Shalala, 845 F. Supp. 1446, 1450 (D. Kan. 1994) (internal quotation marks omitted); see 42 U.S.C. § 405(g). However, I may not rely on the parties' statements as to what was in the record. I myself must examine the Administrative Record and "find and identify facts that support the agency's action." Olenhouse, 42 F.2d at 1576.

## B.    Factual Background

In the Fall of 1987, Plaintiff and her husband flew from their then-home in Morro Bay, California to Detroit, Michigan. See Tran. Admin. R. at 162, 163. They then rented a car in Detroit to travel to Halifax, Nova Scotia, Canada. See id. Before departing California, they had made airplane reservations through a travel agent to fly on October 3 from Halifax to Whitehorse, Yukon, Canada.[14] See id. at 162, 163, 167. From Whitehorse, Plaintiff and her husband then intended to proceed to Skagway, Alaska,[15] on their way home. See id. at 162, 163-64. The exact travel route Plaintiff

---

[14] The date of October 3 is taken from a letter written by Mr. Siler to the ALJ on February 27, 1992. See Tran. Admin. R. at 163-64. In her pleadings, Plaintiff has stated that the October 3 date is incorrect and that, in fact, she and her husband were to leave Halifax on the day she was injured, October 2, and that it took them two days, and not six or seven days, to travel from Van Buren, Maine to Halifax, Nova Scotia, Canada. Because the October 3, 1987, date is the date Plaintiff provided to the ALJ and there is no indication beyond Plaintiff's pleadings that this date is incorrect, the October 3 date is the date I will use. See Olenhouse v. Commodity Credit Corp., 42 F.3d 1560, 1576 (10th Cir. 1994) (district court must conduct plenary review of the record as it existed before the agency).

[15] Plaintiff has stated that she and her husband would have traveled from Whitehorse to Anchorage, Alaska instead of to Skagway if the weather and road conditions and available travel

26

and her husband took from Detroit to Halifax is not given in the Administrative Record. It appears generally, however, from a letter Mr. Siler wrote to the ALJ, that they drove from Detroit to Van Buren, Maine, visiting locations in Canada and Vermont before reaching Maine. See id. at 163. On September 26 or 27, 1987, Plaintiff and her husband left Van Buren, Maine by car for Halifax.[16] See id. at 163. On October 2, 1987, Plaintiff fell and fractured her leg at a restaurant in Windsor, Nova Scotia. See id. at 198-202. After conferring with U.S. military hospitals in New Hampshire and Maine, Plaintiff was advised that she should not be taken to either of these hospitals, but, instead, should be taken to the nearest Canadian hospital as soon as possible. See id. at 194. Consequently, Plaintiff was taken to a hospital in nearby Halifax, where she underwent surgery and was hospitalized for nine days. See id. at 198-202. She submitted her Medicare Part A claim for her Canadian hospital expenses in November 1987. See id. at 198-201, 202.

---

options had so demanded. See Tran. Admin. R. at 163-64. For simplicity's sake, however, I will refer only to the Skagway destination in this Opinion.

[16] These dates were taken from Mr. Siler's February 27, 1992, letter to the ALJ. See id. Plaintiff states in her pleadings that the September 26 or 27 dates are incorrect and that, in fact, she and her husband left Van Buren, Maine on September 30, 1987. Because the September 26 or 27, 1987, dates were the dates provided to the ALJ by Plaintiff and there is no indication beyond Plaintiff's pleadings that these dates are incorrect, the September 26 or 27 dates are the dates I will consider.

## C.  Analysis

The bone of contention here is whether Plaintiff's 1987 Part A medical claim for

her injuries that occurred and were treated in Canada are reimbursable under Medicare.

Title 42 U.S.C. § 1395f(f)(2)(A)(ii) provides that payment may be made for emergency

inpatient hospital services provided by a Canadian hospital if the Medicare beneficiary

was "at a place within Canada while traveling without unreasonable delay by the most

direct route (as determined by the Secretary) between Alaska and another State."  42

U.S.C. § 1395f(f)(2)(A)(ii).  It is uncontested that Plaintiff received emergency

inpatient hospital treatment.

The ALJ, affirming the previous administrative decisions, "found" that (1) the

1987 claim was not covered by Medicare and (2) Plaintiff was liable for repayment of

the charges because the charges were improperly compensated by Medicare.  Tran.

Admin. R. at 160.  Plaintiff argues that the ALJ's decision is erroneous, based on

incorrect geographical facts and erroneous statements of the Administrative Record.  I

conclude that the ALJ's decision is not supported by substantial evidence.[17]  On the

_____

[17] I note, preliminarily, that the ALJ's decision contains both incorrect summaries of the
Administrative Record and erroneous statements of geographical facts, as well as self-contradiction.
The ALJ failed to note that Plaintiff repeatedly requested a review of the initial denial of her Part A
claim before she filed the 1988 lawsuit.  See Tran Admin. R. at 153; see also id. at 203.  The ALJ
failed to recognize that the appeal process provided Plaintiff by Defendant did not accord with
Medicare law.  See id.  The ALJ mistakenly assumed that Whitehorse was accessible by boat, when, in
fact, it is landlocked.  See id. at 156-57.  In the second paragraph of the fifth page of his decision, the
ALJ referred multiple times to "Canada" when he probably meant to refer to "Alaska."  See id. at 157.
In the first full paragraph at page six of his decision, the ALJ not only makes a geographical error
(driving from Maine, one cannot enter Canada at Nova Scotia), but there is no evidence in the record
that Plaintiff was in New Hampshire, and the fact that Plaintiff may have reentered Canada after

contrary, the record shows that the purpose of Plaintiff and her husband's venture into Canada at Nova Scotia was not to visit Canada *per se*, but to travel by the most direct route between Maine and Alaska, on their return home to California. Compare Milkson v. Secretary, 633 F. Supp. 836 (E.D.N.Y. 1986) (Medicare claim for Canadian medical services not covered when beneficiary injured while visiting relative in Canada).

For Plaintiff's claim to be covered by Medicare she must meet three statutory requirements: (1) she must have been traveling between another state and Alaska via Canada; (2) by the most direct route; and (3) without undue delay. See 42 U.S.C. § 1395f(f)(2)(A)(ii). It is difficult to ascertain from the ALJ's decision exactly what findings the ALJ did or did not make.[18] The focus of the ALJ's opinion is on the first statutory requirement and whether Plaintiff intended to travel from Canada to Alaska. See id. at 156-59. The ALJ's sole finding appears to be that there was no proof, beyond Plaintiff's own statements, that Plaintiff and her husband intended to travel to Alaska after their planned arrival in Whitehorse, Canada. This finding is contrary to,

---

leaving Van Buren, Maine (her first entry into Canada appears to have been when she was en route to Maine from Detroit) is legally irrelevant under 42 U.S.C. § 1395f(f)(2)(A)(ii). See id. at 158. More importantly, the ALJ contradicts himself in that paragraph. See id. ("In effect, the claimant, while traveling without unreasonable delay by the most direct route between Alaska and another state (Maine and New Hampshire), reentered Canada at Nova Scotia where the accident took place. Further, Mr. Siler's report of his itinerary negates his assertion that he was traveling by the most direct route bwtween [sic] Alaska and another state.") I find that the ALJ relied on these errors in reaching his decision.

[18] A memorandum prepared for the ALJ by an ALJ advisor in July 1991 also provides little assistance See id. at 203-04.

and not supported by, substantial evidence in the Administrative Record. Plaintiff, through her husband, explained to the ALJ, both at the ALJ hearing and in a letter, that she and her husband intended to travel to Skagway, Alaska after arriving in Whitehorse, Canada.[19]  See id. at 156, 163.  The information provided to the ALJ by Plaintiff's travel agency corroborated Plaintiff's stated intent to enter Alaska.  See id. at 162, 167.

As for the remaining two statutory requirements, the ALJ did not make findings that Plaintiff's trip (as planned or as taken) was not by the most direct route and not without unreasonable delay.  At most the ALJ's few statements on these two subjects were mere conclusions, stated in passing, supported by neither reasoning nor evidence, and, at one point, contradictory.  See id. at 157-59.  Even if the ALJ's statements could be construed as findings that Plaintiff's trip was taken with unreasonable delay and not by the most direct route, such findings are not supported by substantial evidence in the record.  In fact, there is no evidence in the Administrative Record, given Plaintiff's mode of travel (a combination of driving and flying), that a more direct route existed

------

[19] Mr. Siler testified at the ALJ hearing and stated in a letter to the ALJ that, after arriving in Whitehorse, he and Plaintiff were going to proceed without delay to Skagway and that they had no intent to dally in Whitehorse or otherwise remain in Canada after arriving in Whitehorse.  See id. at 156, 163.  In his letter to the ALJ, Mr. Siler further stated that there was absolutely no reason to spend time in Whitehorse, that "Whitehorse [was] the type [of] place where one only goes to get an Alaskan point."  Id. at 163.  The only reason Plaintiff did not have preset travel arrangements from Whitehorse to Alaska was because of the difficulty predicting what the weather and road conditions might be when she arrived in Whitehorse or what the best travel arrangements to Alaska would be.  See id.  Consequently, Plaintiff and her husband decided instead to wait until they arrived in Whitehorse to make the final arrangements for their trip to Alaska.  See id.

from Van Buren, Maine to Skagway, Alaska (via Halifax and Whitehorse, Canada).
Mr. Siler stated that the planned trip from Van Buren, Maine to Skagway, Alaska via
Halifax and Whitehorse was the most direct route. See id. at 156, 163-64. There also
is no evidence in the record that six or seven days is an unreasonable length of time to
travel from Van Buren, Maine to Halifax, Nova Scotia, given Plaintiff's mode of travel
(automobile and airplane), that airplane reservations were made weeks in advance for
Plaintiff's departure from Halifax, the possible road and weather conditions, and the
driving capabilities of Plaintiff and/or her husband. Additionally, there is no evidence
in the Administrative Record that Plaintiff's planned trip from Whitehorse, Canada to
Skagway, Alaska would have been taken with unreasonable delay.

Following a careful and thorough review of the entire Administrative Record, I
find that the ALJ's decision that Plaintiff's trip did not fall within the mandates of
§ 1395f(f)(2)(A)(ii) is not supported by substantial evidence in the record. Plaintiff was
injured and hospitalized for emergency care in Canada while traveling without
unreasonable delay by the most direct route between Maine and Alaska via Canada.
Therefore, the Agency decision was erroneous and will be reversed.

IV. DAMAGES

Plaintiff's 1987 Medicare Part A claim was valid under 42 U.S.C.
§ 1395f(f)(2)(A)(ii). Consequently, Defendant's refusal to honor the 1987 claim and

Defendant's recoupment actions, whereby it withheld Plaintiff's Medicare Part B and Social Security benefits, were invalid.

The damages requested by Plaintiff are of two types--damages that flow solely from this lawsuit, and which, if awardable at all, can be awarded by this Court alone, and damages that flow from Plaintiff's valid 1987 Medicare Part A claim and Defendant's overpayment recoupment efforts, which either this Court or the Secretary has the authority to award. Plaintiff's requests for punitive damages in the amount of $1.00, for prejudgment interest, and for $1000 in costs are in the first category. Because of Defendant's sovereign immunity I cannot award punitive damages, prejudgment interest, or costs unless there is specific statutory authority to do so. See Library of Congress v. Shaw, 478 U.S. 310, 314-18; Missouri Pac. R.R. Co. v. Ault, 256 U.S. 554, 564 (1921); see also Edwards v. Lujan, 40 F.3d 1152, 1153-54 (10th Cir. 1994). I am unaware of any law that would allow me to grant either punitive damages or prejudgment interest in this case. Therefore, I must deny Plaintiff's request for punitive damages and for prejudgment interest.

Plaintiff's costs, including court filing fees and copying costs engendered in this lawsuit, however, may be allowed under 28 U.S.C. § 1920. Plaintiff should submit a bill of her allowable costs to the Clerk of the Court within 30 days of this Opinion. Plaintiff's motion to tax costs must comply not only with § 1920, but also with United States District Court, District of New Mexico, Local Civil Rule 54.1.

I will remand to the Secretary the calculation of Plaintiff's actual damages. To determine damages, the Secretary must determine the correct amount of Plaintiff's 1987 claim in U.S. dollars (applying the pertinent 1987 exchange rate), and the correct percentage of that amount that Medicare would have paid in 1987.[20] Any recoupment by Defendant in excess of what Plaintiff collected from Transamerica via her 1988 default judgment must be added to that amount due Plaintiff.[21] After calculating Plaintiff's actual damages, the Secretary, shall either pay those damages or shall certify that Plaintiff is entitled to those damages, pursuant to 42 U.S.C. § 1395ii (incorporating 42 U.S.C. § 405(i)) or other applicable law. Defendant is cautioned that this Court will not tolerate any further undue delay in this case. After ten years, time, and reason, are of the essence.

### NOW, THEREFORE, IT IS ORDERED:

(1)    *sua sponte*, that *pro se* Plaintiff William W. Siler is dismissed from this lawsuit. Future captions for this case shall reflect this change.

---

[20] It appears that under 42 U.S.C. §§ 1395(d)(3), (f)(4) the payment due Plaintiff is either (1) 60% of the hospital's reasonable charges for routine services furnished in Plaintiff's hospital room plus 80% of the hospital reasonable charges for ancillary services or (2) two-thirds of the hospital's reasonable charges for the services received, if the hospital did not charge separately for routine and ancillary services. I will leave it up to the Secretary to review the 1987 medical bills and determine at what rate the 1987 claim is reimbursable.

[21] For discrepancies in the Administrative Record regarding the amount of the 1998 default judgment and the amount levied, see notes 5 and 6 in the Appendix to this Opinion.

(2)     as requested by Defendant, that the Secretary of the United
        States Department of Health and Human Services, Donna E.
        Shalala, in her official capacity, is substituted for Defendant
        Health Care Financing Administration, as the real party in
        interest in this matter. Future captions for this case shall
        reflect this change.

(3)     that Defendant's Motion to Dismiss or, in the Alternative,
        Motion to Affirm the Agency Decision, filed January 20,
        1998, [Doc. No. 25], is DENIED and the Agency decision
        REVERSED.

(4)     that Plaintiff's request for punitive damages and for
        prejudgment interest is DENIED.

(5)     that in reference to Plaintiff's costs request, Plaintiff may
        submit a motion to tax costs, with supporting material, to
        the Clerk of the Court within 30 days of this Opinion,
        pursuant to 28 U.S.C. § 1920 and District of New Mexico
        Local Civil Rule 54.1.

(6)     that Defendant, in a timely fashion, shall calculate the
        amount of actual damages due Plaintiff and, pursuant to
        applicable law, either pay Plaintiff those damages or certify
        that Plaintiff is entitled to those damages. The amount of
        actual damages due Plaintiff is REMANDED to the
        Secretary for her determination in accordance with the
        directives in this Opinion.

(7)     that Plaintiff's Request for Preliminary Injunction, filed
        May 21, 1997, [Doc. No. 8], is DENIED AS MOOT.

(8)     that Plaintiff's Motion Requesting Oral Argument, filed
        February 20, 1998, [Doc. No. 35], is DENIED.

SENIOR UNITED STATES DISTRICT JUDGE

34

Counsel for Plaintiff Ruth L. Siler: Ruth L. Siler, *Pro Se*, Las Cruces, New Mexico
Counsel for Plaintiff William M. Siler: William M. Siler, *Pro Se*, Las Cruces, New Mexico

Counsel for Defendant: Jan Elizabeth Mitchell, ASSISTANT U.S. ATTORNEY, Albuquerque, New Mexico

## APPENDIX
### Detailed Description of Procedural Facts

In early October 1987, Plaintiff fell and fractured her leg at a restaurant in

Windsor, Nova Scotia, Canada.[1]  See Tran. Admin. R. at 45, 47-50, 198-201, 202.  As

a result of such injury, Plaintiff was hospitalized in Canada for nine days and

underwent surgery.  See id.  On November 26, 1987, Plaintiff submitted a Medicare

Part A claim for $7,204.42 (Canadian dollars)[2] for her in-patient medical expenses

resulting from this injury to the fiscal intermediary responsible for reviewing such

claims, Transamerica Occidental Insurance Company (Transamerica).  See id.  After

no response or action by Transamerica, Plaintiff resubmitted the Part A claim on

December 11, 1987.  See id. at 46, 217-21.  On March 1, 1988, Transamerica

informed Plaintiff that it could not find the listed claims, and requested that Plaintiff

resubmit the Canadian medical bills.  See id. at 46, 197.  The "dates of service" listed

in Transamerica's letter, however, were incorrect--the November and December dates

Plaintiff submitted and resubmitted the 1987 claim were listed, rather than the dates the

Canadian medical services were provided.  See id.  On March 15, 1988, Plaintiff

replied, providing Transamerica once again with copies of the Canadian medical bills

and the Part A claim form Plaintiff had submitted in November and December, and

---

[1] Many of the actions taken in this case by Plaintiff were performed by her husband, Mr. Siler, on her behalf.  I will refer generally, however, to those acts as Plaintiff's acts and not as Mr. Siler's acts.

[2] It appears that the amount of Plaintiff's 1987 claim was never converted from Canadian dollars to U.S. dollars.

informing Transamerica of the "dates of service" error in its March 1 letter. See id. at 46, 197-201. Transamerica denied the claim on April 1, 1988.[3] See id. at 52, 195-96. In Transamerica's denial letter, Plaintiff was informed that she could request a review of the denial by writing to Transamerica before October 1, 1988--a six-month limitation, rather than the 60-day limitation prescribed by Medicare law. See id. at 52, 196. On April 7, 1988, Plaintiff requested a review of the claim denial. See id. at 53, 194. On May 5, 1988, Plaintiff again wrote to Transamerica, stating that she had received no response to her letter requesting a review and requesting that Transamerica pay the claim or inform her of how to proceed because she and her husband did not wish to be forced to take court action.[4] See id. at 54, 192-93. Unfortunately, Plaintiff's repeated review requests were to no avail. On September 9, 1988,

---

[3] According to the 1990 decision of the Part B Hearing Officer and the 1992 decision of the ALJ, described later, Blue Cross and Blue Shield of Maine, a Medicare Part B carrier, informed Plaintiff of the denial of her 1987 Part A claim by letter on December 17, 1987, and March 28, 1988. See Tran. Admin. R. at 81, 88, 153, 209; see also id. at 203. According to the Hearing Officer decision, the first letter was the initial denial and the second letter a denial on reconsideration. See id. at 81, 209. The Hearing Officer decision also stated that the March 28 letter informed Plaintiff that she could request a further appeal by filing a request within six months. See id. However, there is no copy or other mention of either letter in the record (including Transamerica's April 1, 1998, denial of claim letter) or in Defendant's pleadings. Such reviews by Blue Cross Blue Shield of Maine also make no sense under Medicare law. Why Blue Cross and Blue Shield of Maine, in addition to Transamerica, would have been involved in a Part A matter is unexplained. Furthermore, if Plaintiff's 1987 claim had been denied on December 17 and denied again on reconsideration on March 28, 1988, why Transamerica would have denied the claim again on April 1, 1988, is unclear. Transamerica's April 1 denial would not have been part of the required Part B review process. Rather, after the March 28 denial after reconsideration, the next procedural step should have been ALJ review, if Part A process, or Hearing Officer review, if Part B process.

[4] There is some evidence that Plaintiff again requested a review of the Part A claim denial on August 15, 1988, see id. at 58, 187, but no copy of this request letter is in the record.

2

Transamerica finally responded to Plaintiff–but not by providing her with the reconsideration required by law. See id. at 55, 191. Instead, in a nonsequitur, Transamerica informed Plaintiff that it did not handle the type of billing involved and that the services needed to be billed by the hospital to the (unnamed) Plan A Intermediary. See id. Transamerica stated that Plaintiff should contact the hospital billing office to see if the claim had been filed. See id. There was no mention in this letter of Transamerica's earlier denial of the 1987 claim (denial of claim implies previous filing of the claim) and its invitation to appeal its denial within six months or of Plaintiff's request for a review of that denial. See id.

Plaintiff filed suit against Transamerica in municipal court in San Luis Obispo, California on October 5, 1988. See id. at 56, 58, 187, 190. Transamerica did not appear or otherwise respond, and a default judgment was entered against it on November 14, 1988, for an amount unclear from the record.[5] See id. at 56-58, 187-190. Transamerica did not attempt to set aside the default judgment or file an appeal. See id. Plaintiff wrote Transamerica on December 21, 1988, informing it of the

---

[5] A copy of the 1988 court judgment is not part of the Administrative Record. According to an August 24, 1989, letter from Transamerica, the 1988 court judgment was for $3466.42. See Tran. Admin. R. at 65-66, 77-78. According to the Blue Cross Blue Shield Part B Hearing Officer's decision, the small claims court in 1988 issued a series of judgments against Transamerica, totaling $3466.42, plus $54.00 in interest (for a total of $3520.42). See id. at 81, 209. The ALJ's decision states that the judgment rendered in 1988 was $3727.42. See id. at 88, 153. In its letter of November 6, 1992, Transamerica stated that the "actual amount paid to [Plaintiff]" was $3583.42. See id. at 101. According to the August 24, 1989, Transamerica letter, Mrs. Siler owed Defendant $3466.42 for the judgment amount, plus an $117.00 interest fee, for a total of $3583.42. See id. at 66,178. (The overpayment recoupment action of Defendant was generally for $3583.42.) The amount levied appears to be more than the court judgment amount alleged by Transamerica. See infra note 6.

3

judgment. See Tran. Admin. R. at 56, 190. On December 23, 1988, the Health Care

Financing Administration (HCFA) wrote Plaintiff and informed her that Transamerica

had notified it of the judgment, that Medicare law prohibited payment of the judgment,

and that if she wished to discuss the matter to contact Mr. Michael Souza in its San

Francisco office. See id. at 57, 188-89. On January 2, 1989, Plaintiff wrote to the

Medicare Branch of the United States Department of Health and Human Services,

informing it of the above correspondence and court action, that the requirements of the

law had been fully complied with, and that Transamerica had failed to grant her request

for review or to defend or appeal the default judgment against it. See id. at 58, 187.

In February 1989, Plaintiff levied the judgment against Transamerica by garnishment of

its bank account for an amount that is unclear from the record.[6] See id. at 59-64, 181-

86, 222-27, 228.[7]

On August 24, 1989, Transamerica's Recoupment Section informed Plaintiff that

she needed to refund it $3583.42 (the amount of the judgment received according to

Transamerica ($3466.42) plus interest ($117.00)) because she was not entitled to the

---

[6] The 1988 Notices of Levy or Garnishment are part of the record. See id. at 59-64, 181-86, 222-27, 228. There were six levy notices in all, for various amounts, totaling $3637.42. See id. This is an amount higher than what Transamerica alleged the judgment to be. See supra note 5. In addition to the $3637.42 levied or garnished from Transamerica's bank account, Transamerica's bank charged Transamerica levy fees totaling $90. See id. at 228; see also id. at 81, 209. As a result, a total of $3737.42 was taken from Transamerica's bank account. (The Health Care Financing Administration (HCFA) reimbursed Transamerica $3737.42. See id. at 205.)

[7] On July 21, 1989, the HCFA notified Transamerica that it would be reimbursed. See id.

4

"payment" under Medicare law. See id. at 65-68, 177-180. Transamerica threatened Plaintiff that if it did not hear from her in 30 days, it would withhold future Medicare claim payments, and that if the overpayment was not recovered in 90 days, it would refer the case to the HCFA so that the overpayment could be deducted from her Social Security payments. See id. at 66, 178. Notwithstanding its threats, Transamerica also informed Plaintiff of her right to request a new internal review of her claim by requesting one within six months (i.e., February 24, 1989). See id. at 67, 179. (The statute of limitations provided by Medicare law is 60 days.)[8]

Shortly after Transamerica's August 24 letter, Plaintiff timely requested the review offered by Transamerica. See id. at 67, 175. Plaintiff reiterated in her request that Transamerica had failed to respond to her earlier review requests or to the subsequent court action. See id. On September 15, 1989, Transamerica's Overpayment Section informed Plaintiff that her request for a review had been forwarded to Mr. Souza of the HCFA. See id. at 69, 176. On September 19, 1989, Transamerica's Overpayment Section told Plaintiff that instead of sending her review

---

[8] It is at the above juncture that the procedural facts become particularly tenebrous. Transamerica's August 24 overpayment notice appears to have come after a review (and denial) of Plaintiff's 1987 Part A claim. However, it is unclear whether the review was a much belated reconsideration of Plaintiff's Part A claim and resumption of the Part A process by Transamerica or was, instead, an unripe initiation by Transamerica of the Medicare Part B appeals procedure. Either choice is troublesome. The Part A alternative is unsatisfactory given that the type of appeal right Transamerica informed Plaintiff of in its August 24 letter and the appeal rights it would inform her of later do not coincide with the type of appeal rights provided by Medicare Part A law. The Part B option also makes little statutory sense because at that time no Part B claim had been submitted or benefit withheld, as apparently is statutorily required for the Part B procedure to be applicable in this case. (Plaintiff's Part B benefits were not submitted until 1992 and not withheld until 1993.)

5

request to the HCFA, the review request would be forwarded to Transamerica's Appeals Department. See id. at 70, 176. However, just one day later, on September 20, 1989, Plaintiff was informed by Transamerica's Appeals Department, that it had undertaken a "new and separate review" of the disputed 1987 claim, and affirmed its denial and the decision that Plaintiff had been overpaid $3466.42 (an amount different from the previous overpayment statement).[9] See id. at 71-72. (This denial on reconsideration could be categorized as either an extra step not provided for in the Part A procedure or as step two of the Part B procedure.) Transamerica informed Plaintiff that she could request a hearing on the matter by an impartial Hearing Officer by requesting such within six months (i.e., March 20, 1990). See id. at 72. Plaintiff also was informed that she could choose the type of hearing held--in person, by telephone, or on the record. See id. (This Hearing Officer review offer could be categorized as either an extra step not provided for in the Part A procedure or step three in the Part B review procedure.)

---

[9] Notwithstanding the appeal provision in the September 20th letter or the appeal process provided by Medicare law, one week later, on September 28, 1989, Transamerica's Overpayment Section informed Plaintiff that, "[a]ccording to the decision of [the] Medicare Appeals Department[,] the overpayment of $3583.42 has been affirmed." Tran. Admin. R. at 73. Plaintiff was requested to submit the overpayment. See id.

On September 29, 1989, a letter nearly identical to the September 20, 1989, letter was sent to Plaintiff by Transamerica. See id. at 213-15. The only difference between the two letters was that the overpayment amount in the September 29th letter was given as $3583.42. See id. at 214. (The overpayment amount stated in the September 20th letter was $3466.42). The same six-month hearing officer appeal provisions were included. See id.

On October 20, 1989, Plaintiff replied to Transamerica, stating that she wished a review by an authority who was not Transamerica, and that she was waiting to meet with her attorney before replying further. See id. at 74, 174. Without acknowledging the previous six-month appeals opportunities provided to Plaintiff in its earlier letters, Plaintiff's timely requests for each review offered by Transamerica, or review procedures required by the Medicare regulations, on October 30, 1989, Transamerica's Recoupment Unit stated that it had informed Plaintiff on August 24, 1989, that she had to refund the overpayment or contact it within 30 days and that because it had not heard from her it was required to withhold the overpayment from any Medicare benefits payable to Mrs. Siler. See id. at 75, 173. Transamerica then stated that if the overpayment was not refunded as requested the matter would be referred to the HCFA. On November 7, 1989, Plaintiff responded that she and her husband would meet with their attorney on November 15, 1989, and referred Transamerica to her October 20, 1989, letter. See id.

On November, 15, 1989, apparently continuing along either the distorted, appeal-heavy Part A review path or the unripe Part B review path, Transamerica's Hearing Preparation Section informed Plaintiff that it was acknowledging Plaintiff's correspondence and treating it as a request for a hearing, and that the claim would be referred to a Hearing Officer. See id. at 76. On November 16, 1989, Plaintiff wrote a joint letter to Transamerica's Recoupment Unit, Transamerica's Overpayment Section,

7

and Mr. Souza of the HCFA, informing each of inconsistencies in Transamerica/HCFA's response, and Transamerica/HCFA's past failure to respond, and requesting that she be informed by December 5, 1989, if a hearing was to occur. See id. at 77, 172.

On December 1, 1989, a Hearing Officer for Transamerica informed Plaintiff that Transamerica had requested him to treat her October 20, 1989, letter as a request for a Medicare Part B hearing. See id. at 78, 171. The Transamerica Part B Hearing Officer further stated he had no jurisdictional authority to hear the case, and that he was referring the file to the HCFA's Boston Office for coordination with a Hearing Officer of the appropriate carrier, Blue Cross Blue Shield of Massachusetts (BCBS). See id. On June 26, 1990, the BCBS Medicare Part B Hearing Officer wrote Plaintiff and stated it had received her file on June 8, 1990, and that an on-the-record decision would be rendered based on the claim file. See id. at 79. Plaintiff was further informed that if she had requested a formal hearing before a Hearing Officer, one would be scheduled after the on-the-record hearing decision, if she remained dissatisfied. See id. On July 20, 1990, the BCBS Part B Hearing Officer informed Plaintiff that her 1987 Part A claim had been correctly denied and that the threatened Medicare recoupment was appropriate. See id. at 80-85, 207-12. The Part B Hearing Officer further informed Plaintiff that she could either request an in-person or telephone hearing before a new hearing officer, by requesting such within ten days, or she could request a hearing

8

before an ALJ, if such a request was made within 60 days. See id. On August 15, 1990, Plaintiff requested an ALJ hearing. See id. at 85, 86, 170, 207. (This could be categorized as step three in the Part A procedure or as step four in the Part B procedure.) Almost six months later, on February 5, 1991, Plaintiff was informed by a Medicare Part B Hearing Officer that her file was being sent to the HCFA for referral to an ALJ. See id. at 87. On October 19, 1991, Plaintiff requested that the ALJ hearing be scheduled after November 1991. See id. at 168.

The ALJ hearing was held on February 26, 1992, and the ALJ opinion rendered on July 31, 1992, almost two years after Plaintiff's hearing request.[10] See id. at 90, 96, 155, 161. The ALJ affirmed the previous decisions. See id. at 88-96, 153-161. The Notice of Unfavorable Decision from the United States Department of Health and Human Services (HHS) and the Social Security Administration (SSA) attached to the ALJ decision notified Plaintiff that she could appeal the decision to the Appeals Council in Arlington, Virginia, within 60 days of receipt of the notice.[11] See id. at 97-99, 250-52. Mr. Siler, on his wife's behalf, wrote to the Appeals Council on August 18, 1992, questioning which of two possible interpretations of the ALJ decision was correct, and

_____

[10] An ALJ advisor prepared a memorandum for the ALJ on the Siler case on July 22, 1991. See Tran. Admin. R. at 203-04. Mr. Siler wrote to the ALJ the day after the hearing, on February 27, 1992, to provide more information. See id. at 163-67. A travel agent for Plaintiff sent a letter to the ALJ on February 29, 1992. See id. at 162.

[11] Since 1992, the Appeals Council has changed its name, its address, and its organizational or hierarchical structure. See Def. Memo. of Law, Exh. 1; 60 Fed. Reg. 64065 (1995).

requesting an appeal if the more unfavorable of the two interpretations was the correct one. See id. at 100, 240.

On November 6, 1992, Transamerica notified Plaintiff that the ALJ had found against her and that, therefore, she needed to repay the $3583.42 overpayment. See id. at 101-04. Plaintiff interpreted Transamerica's letter to be denial of her Appeals Council review request. See id. at 106, 246. Mr. Siler wrote Transamerica on November 18, 1992, disputing that there had been an overpayment. See id. at 105. Until 1997, Plaintiff's Appeals Council review request appears to be the last step taken in the Plan A and/or Plan B procedure concerning Transamerica's denial of Plaintiff's 1987 Part A claim.

In 1993, Defendant began to withhold Plaintiff's Medicare Part B benefits, as medical claims for those benefits were submitted by Plaintiff's medical care providers. See id. at 107, 111. While the Part B appeals process was initiated, it appears to have been aborted by Defendant after the initial step--presentment of claim by Plaintiff, agency "denial," agency notice to beneficiary of appeal right, and Plaintiff's request for such reconsideration.

In three different notices, one on February 17, 1993, and two on March 1, 1993, Plaintiff was informed that Part B benefits for Part B medical claims she had submitted in May 1992 (for a visit to a doctor and for a chest x-ray) and in November 1992 (for eyeglasses), had been withheld to recoup the alleged overpayment. See id. Both

10

notices informed Plaintiff she could appeal the decision by writing to Transamerica within six months (August 17, 1993, and September 1, 1993, respectively). See id. On March 6, 1993, Mr. Siler wrote Transamerica, objecting to the withholding of his wife's Part B benefits and suggesting legal arbitration might be necessary. See id. at 106. Transamerica's Recoupment Section responded on March 26, 1993, by stating that it had received the March 6 letter and informing Plaintiff that the withheld benefit amount had been applied to her overpayment and of the new overpayment balance, but not acknowledging Plaintiff's objection or implied review request. See id. at 112. Mr. Siler responded on March 31, 1993, by stating that Transamerica's letter did not respond to his letter, and informing it that if it did not respond to Plaintiff or pay Plaintiff what was owed her, he and Plaintiff would seek legal relief. See id. at 113.

Ultimately, on April 14, 1993, Plaintiff sued Transamerica again in San Luis Obispo Municipal Court, California, seeking award of some of the Part B benefits that had been withheld. See id. at 114. Plaintiff informed Transamerica of the small claims court action on May 23, 1993, and again suggested arbitration. See id. at 115. Mr. Siler also wrote to Transamerica on June 4, 1993, and on June 11, 1993. See id. at 116, 117-18. During this time Transamerica removed the municipal court case to federal district court in Los Angeles, and that court then dismissed the case for lack of jurisdiction. See id. at 119, 246. Mr. Siler wrote Transamerica on August 26, 1993, suggesting a settlement plan. See id. at 119, 120. It appears from the Administrative

11

Record that not only did Transamerica not respond to Plaintiff's August 26 letter, but that no review of the withholding of Plaintiff's Part B benefits, either as offered by Transamerica in its early 1993 letters or as required by Medicare law, was ever provided after the initial 1993 determination(s).

On February 10, 1996, the Plaintiff's trip around the administrative appeal mulberry bush began anew.[12] On that date the SSA notified Plaintiff that she had received a Medicare overpayment, that this overpayment had been affirmed by an ALJ, that Transamerica had begun to collect the overpayment by withholding her Medicare Part B benefits, and that if Plaintiff did not refund the overpayment balance within 30 days, her monthly Social Security benefits also would be withheld until the overpayment had been fully recouped. See id. at 121-24. The SSA also informed Plaintiff that she had a right to appeal its overpayment determination by requesting a reconsideration of the determination within 60 days. See id. On February 22, 1996, Plaintiff requested a reconsideration by the SSA. See id. at 125, 126. In a very timely fashion, but to Plaintiff's misfortune, the SSA informed Plaintiff on March 13, 1996, that it would forward her reconsideration request to the HCFA. See id. at 127. On August 23, 1996, Mr. Siler then wrote to Mr. Souza of the HCFA, expressing his frustration with the manner in which his wife's claim and appeal requests had been

---

[12] What procedure was due Plaintiff under Social Security law before her Social Security benefits were withheld was not an issue discussed or briefed by the parties.

handled. See id. at 129.[13] Mr. Souza responded to Mr. Siler on August 30, 1996, with an extremely hostile letter, stating, *inter alia*, that he and Plaintiff could be assured his regional office in San Francisco would "move mountains of earth to recover EVERY CENT owed Uncle Sam" by Plaintiff. Id. at 130-31. Mr. Souza or the HCFA, however, took no action on Plaintiff's February reconsideration request. Mr. Siler replied on September 17, 1996, requesting an unbiased review of the claim. See id. at 132-33.[14] On November 5, 1996, Mr. Souza responded, again unpleasantly, stating, *inter alia*, that Plaintiff had had the right to file a complaint in U.S. District Court "at any time," and asking why no appeal had been filed with the Appeals Council. Id. at 134-35. Mr. Souza also stated that he would "welcome the opportunity for a face-to-face encounter with [the Silers] in United States District Court." Id. at 135. However, again no action was taken on Plaintiff's reconsideration request.

On January 27, 1997, (and on January 30), Mr. Siler wrote to the HCFA's Kansas City Office, informing it that he and his wife had received no response to their February 22, 1996, request for a reconsideration which had been forwarded by the SSA to the HCFA in March 1996. See id. at 138, 139-40. Mr Siler also requested information on how they should proceed, asking for a letter of denial, and asking who

_____

[13] There is no page 128 in the Transcript of the Administrative Record.

[14] On October 15, 1995, Mr. John G. Jones, a member of the Missouri Bar, wrote to the HCFA's Kansas City, Missouri Office on Plaintiff's behalf, requesting that it attend to Plaintiffs' request for reconsideration of the withholding of Plaintiff's monthly Social Security benefit. See Tran. Admin. R. at 136.

would be the proper defendant in a lawsuit against it. See id. Mr. Siler mailed a copy of this correspondence to HCFA's Baltimore Office on January 30, 1997. See id. at 137. On February 4, 1997, the HCFA's Baltimore or Kansas City Office stated that it had transferred Plaintiff's request for a reconsideration to its San Francisco Office. See id. at 141. On March 5, 1997, Mr. Souza of the HCFA's San Francisco Office notified Plaintiff that he had reviewed her request for reconsideration and that it was dismissed "because [she had] exhausted all available administrative appeal mechanisms." Id. at 142-43. Mr. Souza further stated that there was no record of an appeal of the ALJ decision filed with the Appeals Council, and thus, that the ALJ decision was the "final decision of the [HHS] Secretary." Id. at 142. Mr. Souza also notified Plaintiff that the SSA would begin recouping the overpayment amount by withholding her monthly Social Security benefit. See id.

In response to Plaintiff's January 1997 letters and May 1997 telephone conversations,[15] the HCFA Appeals Unit informed Plaintiff in June 1997 that while it

---

[15] On January 27 and January 30, 1997, (and possibly on June 13 and June 17, 1997), Plaintiff wrote to the HCFA's Baltimore and/or Kansas City Offices. On May 6 and May 8, 1997, Plaintiff spoke by telephone with an official from the HCFA's Baltimore Office Appeals Unit. See Tran. Admin. R. at 137-40, 243. A copy of the administrative case documentation was sent in May by Plaintiff to the Appeals Unit at its request. See id. at 243.

On February 14, 1997, June 18, 1997, September 20, 1997, September 21, 1997, September 26, 1997, and September 29, 1997, Plaintiff wrote to the Appeals Council/Departmental Appeals Board. See id. at 229-31, 234, 235-36, 237, 239, 246. Plaintiff has stated that she received a response from the Appeals Council to her letters of February 14, June 18, and September 20, 1997, (and the alleged letter of August 18, 1992) only after receipt of her September 21 letter, which required a return receipt. See id. at 234-36.

In the February 14 letter to the Appeals Council at its Arlington, Virginia address, Plaintiff stated that she had just discovered that before proceeding to federal court she needed a decision from

14

"found" that Plaintiff had submitted a letter requesting a review to the Appeals Council on August 18, 1992, it could not "locate any documentation that would indicate whether or not [the Appeals Council] ha[d] made a decision concerning your request to review the ALJ's decision." Id. at 243-44. The HCFA Appeals Unit advised Plaintiff to again request a review by the Departmental Appeals Board Appeals Council (Appeals Council) at a Washington, D.C. address. See id. at 244. The HCFA Appeals Unit also stated that "[i]f the Appeals Council finds no reason to change the [ALJ] decision, you will be notified in writing explaining its action as well as what right you have to file a civil action in Federal District Court." Id. In addition, the HCFA Appeals Unit described the Appeals Council options of granting of the review request and of remand to an ALJ. See id. No mention was made of untimeliness or of dismissal of the request by the Appeals Council. See id.

Plaintiff filed suit in this Court on March 6, 1997. In March of 1997, Plaintiff sought a temporary restraining order, which was denied by the Magistrate Judge, and in May 1997, Plaintiff sought a preliminary injunction. Both Plaintiff and Defendant requested a stay of proceedings in June 1997 so that Plaintiff could file a new request for reconsideration with the Appeals Council. The Appeals Council request was filed

---

the Appeals Council, and requested a letter of denial. See id. at 239, 246. Plaintiff filed suit a month later, before her June 1997 refiling of an official request of reconsideration with the Appeals Council and before receipt of the Appeals Council's September 1997 decision. (Defendant's exhaustion contention, however, centers on Plaintiff's 1992 letter to the Appeals Council, and not on any argument that Plaintiff's lawsuit was further untimely because it preceded the Appeals Council's September 1997 decision.)

June 19, 1997. See id. at 238, 241-42. On September 26, 1997, the Appeals Council dismissed Plaintiff's June request for untimeliness, see id. at 232-33, 243-44, and the stay was lifted in this case in November 1997.